UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| KATRINA OOZIEL | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| | ) | NO. _____ |
| | ) | |
| VERICON RESOURCES, INC. | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

## **COMPLAINT**

Plaintiff Katrina Ooziel ("Plaintiff" or "Ooziel"), for her Complaint against

Defendant Vericon Resources, Inc. ("Defendant" or "Vericon"), shows the

following:

## **JURISDICTION AND VENUE**

1.

This is a civil action over which original, federal question jurisdiction is

vested in this Court by virtue of 28 U.S.C. § 1331, The Civil Rights Act of 1964,

42 U.S.C. § 2000e et seq.  ("Title VII"), and supplemental jurisdiction of

Plaintiff's Georgia state law claims is vested in this Court under 28 U.S.C. § 1367.

2.

Venue is appropriate in this Court as this action is brought in a judicial district in which Plaintiff was employed by Defendant and would continue to be employed but for the unlawful and discriminatory actions of the Defendant.

## PARTIES

3.

Plaintiff Katrina Ooziel ("Ooziel") is a female individual residing in Georgia.   From her hire in or about December 1996 until her termination in August 2012, Ooziel was employed by Defendant.

4.

Defendant Vericon Resources, Inc. is a Georgia Corporation with its principle place of business at 3550 Engineering Dr., Suite 225, Norcross, Georgia 30092.   Vericon's majority owner and Chief Executive Officer is Marcia Thiel, and Vericon may be served by personal service on Thiel.

## FACTS

5.

Vericon is in the Human Resources Business.  In particular, it is a company that specializes in performing pre-employment background checks for employers. On its website, Vericon describes itself as "a global leader in background screening services."   Vericon's majority owner and Chief Executive Officer is Marcia Thiel.

6.

As a company that is closely tied to the Human Resources community, and one that represents to its customers that it is closely tied to HR organizations, Vericon is aware of its legal obligation to refrain from unlawful discrimination, and to quickly correct such unlawful discrimination when it occurs.  Despite this fact, Vericon (through its owner, Thiel) engaged in acts of discrimination against Ooziel for the sole reason that she had become pregnant with her third child.

7.

Plaintiff was hired by Vericon in December of 1996, and worked at the company until her termination in August 2012.   Her job performance was stellar -- so much so that by 2001 she was promoted to Director of Client Services.

8.

By 2002, Plaintiff had effectively become the number 2 employee at Vericon (under Thiel) and became largely responsible for the day-to-day operations of Vericon.

9.

Beginning in approximately 2007 or 2008, owner Thiel began substantially reducing her (Thiel's) hours at Vericon.  Thiel increasingly left the day-to-day operations to Plaintiff, and a small number of other Vericon senior management employees.  For her work in essentially running the day-to-day operations of

Vericon, Plaintiff was compensated at a rate of $65,000 per year, plus a commission equal to 10% of gross revenue earned on customer accounts that had been brought in by Plaintiff (with the commission payments for each customer lasting for 24-months from the customer's start-date with Vericon).

10.

In the fall of 2011, at the age of 45, Plaintiff learned that she was pregnant with her third child.  In December 2011, following her first trimester, Plaintiff approached Thiel and informed Thiel that she was pregnant with her third child and to discuss with Thiel her maternity leave.

11.

Thiel was surprised when Plaintiff announced her pregnancy.  Among other things, Thiel stated that she was "light-headed" and she placed her head between her knees for a few minutes.  In the weeks that followed, Thiel took steps that made clear that, because of Plaintiff's surprise pregnancy, Thiel did not plan for Plaintiff to remain in a key position with the company.

12.

Following the announcement that Plaintiff was pregnant, Thiel substantially reduced her communications with Plaintiff, and became distant and non-responsive because of the pregnancy.  Among other things, Plaintiff was not invited to meetings that she would have ordinarily attended.

13.

In approximately early 2012, Thiel approached Plaintiff to confirm Plaintiff's due date (which was in June 2012).  Thiel also stated that she wanted to "remind" Plaintiff that company policy was limited to 6-weeks of unpaid maternity leave.

14.

Plaintiff was surprised by this sudden and unexpected "reminder," and she reminded Thiel that she had previously been given 12-weeks of maternity leave when she had her last child 13 years earlier.

15.

As Thiel was aware, other Vericon employees had received more than 6-weeks of maternity leave, and Vericon's policy allowed for employees to take maternity leave/disability leave for the birth of a child.

16.

When Plaintiff reminded Thiel that she had previously been given 12-weeks of maternity leave, Thiel responded that (despite its millions in revenues), Vericon was "too small and it was too big a burden" for Plaintiff to be away that long. Thiel also "reminded" Plaintiff that her leave would be unpaid.

17.

Plaintiff informed Thiel that she would do her best to return to work after 6-weeks, but also shared her concern regarding how quickly she could "bounce back" from child birth in light of her age.

18.

On or about June 4, 2012, one week prior to the start of Plaintiff's maternity leave, Thiel called Plaintiff into her office, and announced that she was "revamping the company."  Thiel told Plaintiff she was hiring a new (unnamed) person, and that Plaintiff would report to that new person if she returned from maternity leave.

19.

In the same meeting that occurred on or about June 4, 2012, Thiel also told Plaintiff that, if she wanted to remain at the company, she would no longer be Director of Client Services, but instead would be reduced to the role of a National Accounts Manager.

20.

Thiel also told Plaintiff that, if she returned to work after her leave, she would no longer have any individuals reporting to her.

21.

Thiel also told Plaintiff that the commission portion of her compensation would end upon her return from maternity leave, and that she would not receive the full compensation that had been promised to her, and that Plaintiff had earned.

22.

Thiel took the actions described in Paragraphs 18-21 above because of Plaintiff's pregnancy.

23.

Recognizing that she was telling Plaintiff that she would effectively lose her career and position at the company if she returned after the birth of her child, Thiel then told Plaintiff that she could leave the company and take a severance package of $20,000 (approximately 3-months' salary) and sign a release of all legal claims.

24.

Approximately four days later (on Plaintiff's final day before her maternity leave and following an ice-cream party that Plaintiff had sponsored for Vericon's staff), Thiel approached Plaintiff and asked her whether she had decided to resign her employment.  Plaintiff asked for additional time to consider the decision, and Thiel told her she needed an answer within a week.

25.

Thiel expected Plaintiff to resign her employment, rather than return to a greatly diminished position with no real future, and Thiel was unhappy when Plaintiff stated that she was going to return despite the demotion.

26.

During Plaintiff's maternity leave, she received payments for 3-weeks of salary because she had accrued a paid time off benefit (known at Vericon as a "time bank") and commission payments.  Despite the fact that Plaintiff had indisputably accrued these payments before Plaintiff's return, Thiel sent Plaintiff a text message making clear that she expected Plaintiff to return the payments that Plaintiff was entitled to receive.

27.

Plaintiff returned to work on August 6, 2012 (after taking two additional weeks of disability leave for post-partum depression).  When she returned to work, it became readily apparent that she was not expected to return and was not welcome in the workplace.  It also became apparent that Thiel was seeking to find a way to terminate her employment -- either by forcing Plaintiff to resign or concocting an alleged reason to terminate her involuntarily.

28.

Thiel had moved Plaintiff out of her office, and into a new small office. Plaintiff learned of this fact when she saw a written note taped on the door and by the fact that a few of her books and two dead plants were moved into the office.

29.

Thiel did not communicate with Plaintiff about her return or her expected job duties in her newly demoted position.  Further, Thiel did not bother telling Vericon's staff about the demotion, or the fact that these individuals no longer were reporting to Plaintiff -- leaving Plaintiff to guess about what job duties (if any) she was expected to carry out.

30.

For two weeks, Thiel left Plaintiff guessing as to what role (if any) she was supposed to play at the company and declined to communicate with Plaintiff about her job duties and responsibilities.

31.

It was clear to Plaintiff that her days were numbered at the company because of Thiel's unlawful actions because of Plaintiff's pregnancy.  While not literally terminated yet, it was clear that Plaintiff had effectively been terminated and in effect had no job or future at the company.

32.

Thiel had done no "revamping" at the company and had hired no one as she had claimed she intended to do.  The "revamp" was only directed at Plaintiff because of her pregnancy.  Thiel wanted Plaintiff to leave the company because of her pregnancy.

33.

On approximately August 15, 2012, Plaintiff learned that Lexis/Nexis had posted an opening for a Department Manager.  While Plaintiff had never applied for any other position while employed at Vericon, in light of the events of 2012 and her recognition that her employment at Vericon was effectively over, she applied on-line for that position.

34.

On August 20, 2012, Thiel sent Plaintiff a text message directing Plaintiff to call her.  When Plaintiff called, Thiel ended her 16-years of employment over the telephone -- telling Plaintiff that her job application was a "huge conflict of interest."

35.

The stated basis for termination was pretextual (indeed, so pretextual that Thiel could not bring herself to even terminate Plaintiff in person after 16 years of employment).  Plaintiff's application to work at a new employer (particularly when

she was had been demoted, removed from her supervisory responsibility at the

company and was effectively in the process of being discharged from Vericon) did

not violate any "conflict of interest" policy at Vericon.  Indeed, Thiel even offered

to pay Plaintiff $20,000 to leave the company.

36.

Thiel never spoke to Plaintiff again, but subsequently sent her an e-mail that

made clear that Plaintiff would not receive remaining commission payments owed

to her.

## ADMINISTRATIVE PREREQUISITES

37.

On November 2, 2012, Plaintiff filed a Charge Of Discrimination with the

Equal Employment Opportunity Commission ("EEOC Charge").

38.

In her EEOC Charge, Ooziel alleged that the Corporate Defendants had

engaged in sex discrimination and retaliation in violation of Title VII of the Civil

Rights Act of 1964 ("Title VII").

39.

Less than 90 days prior to the filing of this Complaint, Plaintiff received her

right to sue letter, dated July 26, 2013, from the EEOC on her Charge.

40.

All administrative prerequisites for filing a Title VII claims against the

Defendant have been fully satisfied by Plaintiff.

## **CLAIMS**
## **COUNT ONE**
### **(Unlawful Discrimination In Violation Of Title VII)**

41.

Plaintiff repeats and incorporates by reference all of the allegations set forth

in paragraphs 1-40 above as if set forth fully herein.

42.

Vericon is an "employer" under Title VII, as it is engaged in an industry

affecting commerce and has had fifteen or more employees for each working day

in each of twenty or more calendar weeks in the current and preceding calendar

year.

43.

Under Title VII it is unlawful for an employer to discriminate against any

individual with respect to his or her compensation, terms, conditions or privileges

of employment because of such individual's sex and/or pregnancy status.

44.

Defendant Vericon discriminated against Plaintiff because of her sex and

pregnancy status in at least the following ways:  (a) engaging in a one-person

reorganization of Vericon that affected only Plaintiff in June 2012; (b) demoting Plaintiff to the position of National Accounts Manager; (c) stripping Plaintiff of all direct reports; (d) stripping Plaintiff of substantial portions of her compensation; (e) refusing to provide Plaintiff with maternity leave consistent with Vericon policy; (f) refusing to pay Plaintiff for time off that she had accrued; (g) refusing to communicate with Plaintiff regarding her job duties and responsibilities following her return from maternity leave; (h) stripping Plaintiff of benefits of her position, including her office; (i) attempting to coerce Plaintiff to resign her employment for a small severance payment; (j) when Plaintiff's efforts to force Plaintiff to resign were unsuccessful, terminating Plaintiff's employment; and (k) following Plaintiff's termination, refusing to pay commission payments that were due and owing.

45.

As a result of the unlawful conduct of the violations of Title VII's prohibition against sex and pregnancy discrimination, Plaintiff has suffered losses, including but not limited to, the loss of employment, the loss of pay and benefits, and emotional distress.

46.

Plaintiff is entitled to a declaratory judgment that the actions of the Defendant violated Title VII and is entitled to other remedies, including, but not

limited to, back pay and benefits, front pay and benefits, compensatory damages, punitive damages, interest, attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays:

A.     That a declaratory judgment be issued declaring that the actions of Defendant violated Title VII and that Plaintiff be awarded injunctive relief under Title VII;

B.     That judgment be entered in favor of Plaintiff and against Defendant awarding Plaintiff all remedies available under Title VII, including but limited to, front pay and benefits, back pay and benefits, compensatory damages, punitive damages, interest, attorneys' and experts' fees, and costs;

C.     That Plaintiff be awarded her costs and expert and attorneys fees for all costs and fees incurred in connection with this matter;

D.     That Plaintiff be awarded such other and further relief that the Court deems just and equitable;

E.     That the Court retain jurisdiction over Defendants until such time as it is satisfied that it has fully remedied the practices complained of and are determined to be in full compliance with the law and that all amounts awarded are paid to Plaintiff by Defendants.

Respectfully submitted,


s/Thomas J. Munger
Georgia Bar No. 529609

MUNGER & STONE, LLP
999 Peachtree Street, N.E.
Suite 2850
Atlanta, Georgia 30309
Telephone: (404) 815-0829
Facsimile:  (404) 815-4687



s/Benjamin A. Stone
Georgia Bar No. 683850

MUNGER & STONE, LLP
999 Peachtree Street, N.E.
Suite 2850
Atlanta, Georgia 30309
Telephone: (404) 815-0933
Facsimile:  (404) 815-4687

Counsel for Plaintiff